Slip Op. 18-34

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARCELORMITTAL USA LLC, | |
| Plaintiff, | |
| and | |
| AK STEEL CORPORATION, NUCOR CORPORATION, and UNITED STATES STEEL CORPORATION, | Before: Judge Gary S. Katzmann, |
| Plaintiff-Intervenors, | Court No. 16-00173 |
| v. | **PUBLIC VERSION** |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NOVOLIPETSK STEEL PUBLIC JOINT STOCK COMPANY, | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Motion for Judgment on Agency Record 56.2 on behalf of Plaintiff ArcelorMittal USA LLC and Plaintiff-Intervenors AK Steel Corporation, Nucor Corporation, and United States Steel Corporation is denied.]

Dated: April 3, 2018

<u>Paul Rosenthal</u> and <u>Melissa Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for plaintiff. With them on the brief were <u>Kathleen W. Cannon</u>, <u>R. Alan Luberda</u>, and <u>John M. Herrmann</u>.

<u>Alan H. Price</u>, <u>Timothy C. Brightbill</u>, and <u>Christopher B. Weld</u>, Wiley Rein LLP, of Washington, DC, for plaintiff-intervenor, Nucor Corporation.

<u>Thomas M. Beline</u> and <u>Sarah E. Schulman</u>, Cassidy Levy Kent LLP, of Washington, DC, for plaintiff-intervenor, United States Steel Corporation. On the brief were <u>Jeffrey D. Gerrish</u> and <u>Luke A. Meisner</u>, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC.

Daniel L. Schneiderman and Stephen A. Jones, King & Spalding LLP, of Washington, DC, for plaintiff-intervenor, AK Steel Corporation.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Renée A. Burbank, Senior Trial Counsel.  Of counsel on the brief was Lydia C. Pardini, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Valerie Ellis, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for defendant-intervenor Novolipetsk Steel Public Joint Stock Company.  With her on the brief was William H. Barringer.

Katzmann, Judge:  This case presents the confluence of agency determinations, principles of the law of contracts, and the interpretation of statute as applied to domestic and foreign generally accepted accounting principles.  The following questions are posed:  in an investigation into whether a foreign exporter is selling imported merchandise in the United States market at less than fair value, how should the United States Department of Commerce International Trade Administration ("Commerce") determine the date on which the imported merchandise is sold, and thus define the universe of sales that fall within Commerce's period of investigation?  When a domestic party with a stake in the matter suggests a date of sale that differs from Commerce's selected date, what is, and who carries, the attendant burden of demonstrating the correct date?  Further, which of the foreign exporter's financial statements should Commerce use in determining its financial expense ratio?

Plaintiff ArcelorMittal USA LLC ("ArcelorMittal"), on behalf of itself and plaintiff-intervenors AK Steel Corporation, Nucor Corporation, and United States Steel Corporation, challenges Commerce's final determination in the less than fair value investigation involving imports of certain cold-rolled steel flat products ("cold-rolled steel") from the Russian Federation ("Russia").  See Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final

Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical

Circumstances, in Part, 81 Fed. Reg. 49,950 (Dep't Commerce July 29, 2016) ("Final

Determination") and accompanying Issues and Decisions Memorandum (Dep't Commerce July

20, 2016) ("IDM").

Specifically, ArcelorMittal argues that:  (1) Commerce should have used the date of

contract between Novex Trading (Swiss) SA ("Novex") -- the exporting arm of mandatory

respondent Novolipetsk Steel OJSC (known collectively with its affiliates as "NLMK") -- and its

U.S. customers, rather than the date of invoice, as the date of sale in determining the universe of

transactions subject to investigation; and (2) Commerce should have relied on NLMK's 2014

unconsolidated financial statements prepared in accordance with Russian Accounting Standards

("RAS"), rather than its 2014 consolidated financial statements prepared in accordance with U.S.

generally accepted accounting principles ("GAAP"), to calculate NLMK's financial expense ratio.

See R. 56.2 Mot. for J. on the Agency Record (June 7, 2017), ECF No. 51; Mem. in support of R.

56.2 Mot. of Pl. and Pl.-Inters. for J. on the Agency Record (June 7, 2017), ECF Nos. 52–53 ("Pl.'s

Br.").  Defendant the United States ("the Government") and defendant-intervenor NLMK oppose

ArcelorMittal's motion.  See Resp. to Mot. for J. on the Agency Record (Aug. 21, 2017), ECF

Nos. 55, 58 ("Def.'s Br."); Resp. to Mot. for J. on the Agency Record (Aug. 21, 2017), ECF Nos.

56–57 ("Def.-Inter.'s Br.").

## BACKGROUND

A.   Legal Background

Pursuant to United States antidumping laws, Commerce investigates whether there exists,

and imposes duties on, subject merchandise that "is being, or is likely to be, sold in the United

States at less than fair value," i.e. dumped, and that causes material injury or threat of material

injury to a domestic industry.  19 U.S.C. § 1673 (2012).[1]  "The term 'subject merchandise' means the class or kind of merchandise that is within the scope of an investigation."  19 U.S.C. § 1677(25).  "[A]n antidumping analysis involves a comparison of export price or constructed export price in the United States with normal value in the foreign market."  19 C.F.R. § 351.401 (2016). "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States)."  Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1326 (Fed. Cir. 2017). Normal value is defined as "the price at which the foreign like product is first sold . . . in the exporting country [i.e., the home market]."  19 U.S.C. § 1677b(a)(l)(B)(i).  Export price, or constructed export price, means the price at which the subject merchandise is first sold to an unaffiliated purchaser in the United States.  19 U.S.C. § 1677a(a)–(b).

The date on which the subject merchandise is sold in the U.S. market, known in this context as the date of sale, factors into the calculation of the export price, which is then compared to normal value.  See Yieh Phui Enter. Co. v. United States, 35 CIT ___, ___, 791 F. Supp. 2d 1319, 1322 (2011).  The date of sale therefore defines the universe of sales that fall within Commerce's period of investigation ("POI"), and that are subject to Commerce's less than fair value determination.

Commerce's regulation 19 C.F.R. § 351.401(i) directs its date of sale determination:

> In identifying the date of sale of the subject merchandise or foreign like product, [Commerce] normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  However, [Commerce] may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

---

[1] Citations to the U.S. Code are to the official 2012 edition.

Commerce thus possesses discretion to select an alternate date of sale; however, an interested party

proposing a date of sale other than the presumptive invoice date must demonstrate that the material

terms of sale were "firmly" and "finally" established on its proposed date of sale. Toscelik Profil

v. Sac Endustrisi A.S., 41 CIT ___, ___, 256 F. Supp. 3d 1260, 1263 (2017) (citing Antidumping

Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,348–49 (Dep't Commerce May

19, 1997) ("Preamble")). To successfully rebut Commerce's presumptive selection of the invoice

date, an interested party must also demonstrate "that a reasonable mind has one, and only one, date

of sale choice." Id. (citing Allied Tube and Conduit Corp. v. United States, 24 CIT 1357, 1371–

72, 127 F. Supp. 2d 207, 220 (2000) ("Plaintiff . . . must demonstrate that it presented Commerce

with evidence of sufficient weight and authority as to justify its [date of sale] as the only reasonable

outcome. If, however, the record indicates that Commerce's decision to use the invoice date as

the date of sale was reasonable and was supported by substantial evidence, Plaintiff's arguments

must fail.")).

B.      Factual Background

On July 28, 2015, domestic producers of cold-rolled steel[2] filed petitions with Commerce

and the U.S. International Trade Commission seeking the issuance of antidumping duty and

countervailing duty orders on imported cold-rolled steel from Russia and other countries. See

Petitions for the Imposition of Antidumping and Countervailing Duties: Certain Cold-Rolled Steel

Flat Products from Brazil, the People's Republic of China, India, Japan, the Republic of Korea,

the Netherlands, Russia, and the United Kingdom (July 28, 2015), CR 1–11, PR 1–9. Commerce

---

[2] The petitioners were ArcelorMittal USA LLC, AK Steel Corporation, Nucor Corporation, and United States Steel Corporation, who are now parties in this case. Final Determination at 49,950 n.2.

initiated the less than fair value investigation on imports of cold-rolled steel from Russia on August

17, 2015.  See Certain Cold-Rolled Steel Flat Products From Brazil, the People's Republic of

China, India, Japan, the Republic of Korea, the Netherlands, the Russian Federation, and the

United Kingdom: Initiation of Less-Than-Fair-Value Investigations, 80 Fed. Reg. 51,198 (Dep't

Commerce Aug. 24, 2015), PR 41.  The POI for Russia was July 1, 2014 to June 30, 2015.  Id.;

see 19 C.F.R. § 351.204(b)(1) (2016).

　　　　Pursuant to 19 U.S.C. § 1677f-1(c)(2),[3] Commerce selected two respondents for individual

examination:  Severstal Export GmbH and PAO Severstal (collectively "Severstal") and NLMK.

See Selection of Respondents for the Antidumping Duty Investigation on Certain Cold-Rolled

Steel Flat Products from the Russian Federation, at 5 & n.15 (Sept. 14, 2015), CR 31, PR 72.

　　　　Commerce issued an antidumping duty questionnaire to NLMK in September 2015.  See

Section A Questionnaire (Sept. 17, 2015), PR 78; Section B–E Questionnaire (Sept. 18, 2015), PR

82.  NLMK responded over the subsequent months.  See NLMK's Section A Questionnaire Resp.

(Oct. 16, 2015), CR 47–80, PR 108–10 ("Sec. A QR"); NLMK's Section B Questionnaire Resp.

---

[3] In antidumping duty investigations or administrative reviews, Commerce may select mandatory
respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping
> margin determinations [in investigations or administrative reviews]
> because of the large number of exporters or producers involved in the
> investigation or review, the administering authority may determine
> the weighted average dumping margins for a reasonable  number of
> exporters or producers by limiting its examination to—
>> (A) a sample of exporters, producers, or types of products that
>> is statistically valid based on the information available to the
>> administering authority at the time of selection, or
>> (B) exporters and producers accounting for the largest
>> volume of the subject merchandise from the exporting
>> country that can be reasonably examined.

(Nov. 4, 2015), CR 91–106, PR 131–32 ("Sec. B QR"); NLMK's Section C Questionnaire Resp.

(Nov. 6, 2015), CR 114–18, PR 140–41 ("Sec. C QR"); NLMK's Section A Suppl. Questionnaire

Resp. (Nov. 18, 2015), CR 144–228, PR 164–65 ("Sec. A SQR"); NLMK's Section B and C Suppl.

Questionnaire Resp. (Feb. 12, 2016), CR 435–56, PR 274–75 ("Sec. B–C SQR").

On March 8, 2016, Commerce published a notice of its affirmative preliminary

determination of sales at less than fair value for imports of cold-rolled steel from Russia. See

Certain Cold-Rolled Steel Flat Products from the Russian Federation: Affirmative Preliminary

Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical

Circumstances, and Postponement of Final Determination, 81 Fed. Reg. 12,072 (Dep't Commerce

Mar. 8, 2016), PR 404 and accompanying Preliminary Determination Memorandum (Dep't

Commerce Feb. 29, 2016), PR 296 ("PDM"). Commerce noted that under the relevant regulation,

19 C.F.R. § 351.401(i), it will normally use a respondent's date of invoice, as recorded in the

respondent's records kept in the ordinary course of business, as the date of sale, unless it

determines that a different date better reflects the date on which the exporter or producer

establishes the material terms of sale. PDM at 23. Commerce thus preliminarily determined

NLMK's date of sale using Novex's invoice date, which NLMK had reported to Commerce as the

date on which the material terms of sale were established. Id. at 24; see Sec. B QR at 24–25.

Commerce additionally preliminarily based NLMK's financial expense ratio on NLMK's

unconsolidated 2014 fiscal year audited financial statements, prepared in accordance with Russian

Accounting Standards ("RAS"). PDM at 29; see Sec. A QR at Ex. 24. Commerce preliminarily

assigned NLMK a weighted average dumping margin of 16.89 percent. 81 Fed. Reg. at 12,073.

Subsequently, Commerce conducted verification of NLMK's questionnaire responses.

Verification of the Cost Response of Novolipetsk Steel OJSC in the Antidumping Duty

Investigation of Cold-Rolled Flat Products from the Russian Federation (Apr. 26, 2016), CR 629, PR 345 ("Cost Verification Report"); Verification of the Sales Response of Novex Trading (Swiss) SA and Novolipetsk Steel OJSC in the Antidumping Duty Investigation of Cold-Rolled Flat Products from the Russian Federation (June 9, 2016), CR 639, PR 360 ("Sales Verification Report"); see 19 C.F.R. § 351.307(c) (2016). Regarding the date of sale issue, Commerce observed that NLMK "consistently reported the invoice date as the date of sale for [the] home market and U.S. sales market." Sales Verification Report at 6.

In its questionnaire responses and at verification, NLMK provided copies of the handful of contracts between Novex and its U.S. customers that pertain to all of NLMK's reported United States transactions during the POI.[4] Sales Verification Exs. SV-23, CR 594, PR 340–41; SV-24, CR 595–600, PR 340–41; SV-25, CR 601, PR 340–41; SV-26, CR 602, PR 340–41; see Sec. A QR at 18, 20; Sec. B QR at 25; Sec. A SQR at Exhibit SA-4; Sec. B–C SQR at Exhibit S2BC-4. Each of these contracts contains two clauses which state that the mill specification sheet appended to each contract are integral to the contracts,[5] and another clause stating the quantity covered by that contract in metric tons plus or minus a certain percentage.[6] A provision allowing for the ultimate sale of a certain quantity above or below a contracted quantity -- found here in the faces of the contracts as to each contract's total quantity, and in the attached mill specification sheets as to each specification's quantity -- is referred to as a "tolerance." See IDM at 45–47. At

---

[4] There are [[    ]] contracts pertaining to [[         ]] transactions.

[5] [[                    ]] and [["11. Packing/Marking,"]] both of which state that the mill specification sheet appended to each contract [[                                    ]].

[6] [[                ]] states the quantity covered by that contract in metric tons plus or minus [[                    ]].

verification, Commerce accordingly examined a handful of sales trace packages for the U.S.

market.[7]  See Sales Verification Report at 6–7.  Commerce found that "the specifications contained

in the contract do not specify the actual quantities or the date of shipment; rather, the quantities

contained in the contract or specifications were described in a range," wherein both the total

contract and each specification denoted quantities and ranges.  Id.  Commerce observed that "[t]he

actual quantities sold and shipped for each specification are not finalized until the invoice date,"

and that for a particular specification[8] ("Specification at Issue") in the contract for U.S. Preselect

Sale No. 2, found in Sales Verification Exhibit SV-24,[9] the quantity shipped was outside of the

tolerance for that specification.  Id. at 6–7; Sales Verification Exhibit SV-24 at 5 ("U.S. Preselect

Sale No. 2").

Regarding the financial expense ratio issue, Commerce observed that "NLMK prepares

audited consolidated financial statements in accordance with the [GAAP] prevailing in the United

States" and verified that NLMK's reported net financial expense ratio is based on the amounts

reflected in the 2014 fiscal year audited consolidated financial statements prepared in accordance

with U.S. GAAP.  Cost Verification Report at 4, 26.  It rejected the use of the 2014 unconsolidated

RAS statements and 2015 financial statements prepared in accordance with IFRS during the cost

verification as well.  Id. at 4–5.

Petitioners and NLMK filed their respective case briefs on June 17, 2016.  Petitioners'

Case Brief, CR 651–53, PR 372–73; NLMK Case Brief, CR 648, PR 368.  The parties filed their

---

[7] [[      ]] sales trace packages.

[8] Specification number [[    ]].

[9] Internally, this sales contract is labeled [[                          ]].

rebuttal case briefs on June 22, 2016.  Petitioners' Rebuttal Brief, CR 659, PR 379; NLMK

Rebuttal Brief, CR 654–55, PR 375.

On July 29, 2016, Commerce published its <u>Final Determination</u>.  81 Fed. Reg. 49,950.

Commerce continued to use Novex's invoice date as the date of sale, because the record evidence

of the investigation demonstrated that "one or more material terms of Novex's contracts changed

after the dates of Novex's contracts."  <u>IDM</u> at 46.  Commerce disagreed with Petitioners that the

quantity term for a contract would not be altered so long as the final quantity shipped remained

within the aggregate weight tolerance specified in the contract.  <u>Id.</u>  Even if exceeding contractual

tolerance provisions were to constitute a material change in quantity, noted Commerce, "it would

be more appropriate to examine the weight tolerance on a specification basis, rather than a contract

basis."  <u>Id.</u>  This was because, Commerce found, each of Novex's contracts at issue contained a

combination of specifications of cold-rolled steel, and each specification was different from

another within the contract.  <u>Id.</u>  "Specification is one of the physical characteristics of [the]

merchandise under investigation . . . [and] it is associated with industry standards, designation,

type, or grade of a product."  <u>Id.</u> at 46 n.187.  Commerce stated that "each of the contracts at issue

contains specific language demonstrating that mill specification sheets" -- attached to each contract

and containing quantity tolerances for each specification -- "form an integral part of the sales

contract."  <u>Id.</u> at 46.  Commerce found that "the quantity shipped for one specification in one

contract" -- the Specification at Issue in U.S. Preselect Sale 2, recorded in the NLMK Sales

Verification Report at Exhibit SV-24 -- "which accounted for a significant portion of the total

reported U.S. sales is substantially outside the weight tolerance specified in the contract, and thus

the quantity term of that contract changed after the date of the contract."  <u>Id.</u> at 46–47 (citing U.S.

Preselect Sale No. 2).

Regarding the financial expense ratio issue, Commerce employed NLMK's U.S. GAAP 2014 consolidated audited financial statements, rather than the unconsolidated RAS 2014 fiscal year audited financial statements that it had used in the preliminary determination to calculate the financial expense ratio.  IDM at 55.  Commerce stated that the consolidated audited financial statements "are at the highest level of consolidation available, and the preparation of such statements, which follow U.S. GAAP, is permitted by Russian law No 208-F2."  Id.  Commerce further stated that it is the agency's "long-standing practice to rely on the amounts reported in the consolidated financial statements at the highest level available to calculate the net financial expense ratio."  Id. at 56.  Commerce also explained that it had preliminarily used the unconsolidated RAS statements because it was uncertain at that time whether the 2014 consolidated U.S. GAAP statements represented the highest level of consolidation and included the operating results of NMLK.  Id. at 53.

Commerce calculated a final weighted-average dumping margin of 1.04 percent for NLMK.[10]  Final Determination at 49,951.  Because the 1.04 percent dumping margin calculated for NLMK was less than the 2.0 percent de minimis threshold under the statute, Commerce terminated the less than fair value investigation with respect to NLMK.  Id.; see 19 U.S.C. §§ 1673d(a)(4), 1673b(b)(3).

ArcelorMittal initiated this action challenging Commerce's Final Determination on August 29, 2016.  Summons, ECF No. 1.  ArcelorMittal filed its complaint on September 28, 2016.  Compl., ECF No. 9.  AK Steel moved to intervene as plaintiff-intervenor on October 7, 2016.  ECF

---

[10]  Severstal received a 13.36 percent rate, which also became the "all-others" rate.  Final Determination at 49,951; see 19 U.S.C. § 1673d(c)(5)(A).

No. 11.  The court granted that motion on October 12, 2016.  ECF No. 15.  Nucor moved to

intervene as plaintiff-intervenor on October 18, 2016, and the court granted that motion the

following day.  ECF Nos. 16, 20.  NLMK moved to intervene as defendant-intervenor on October

21, 2016.  ECF No. 22.  The court granted that motion on October 27, 2016.  ECF No. 26.  U.S.

Steel moved to intervene as plaintiff-intervenor on October 28, 2016.  ECF No. 27.  The court

granted that motion on October 31, 2016.  ECF No. 31.[11]

ArcelorMittal moved for judgment on the agency record pursuant to USCIT Rule 56.2 on

June 6, 2017.  Pl.'s Br.  The Government and NLMK each responded in opposition on August 21,

2017.  Def.'s Br.; Def.-Inter's Br.  ArcelorMittal filed its reply on November 8, 2017.  ECF Nos.

62–63 ("Pl.'s Reply").  Oral argument was held before the court on January 31, 2018.  ECF No.

72.  At the court's invitation, the parties submitted notices of supplemental authority relevant to

contentions raised at oral argument between February 6 and 7, 2018.  ECF Nos. 73–76.

---

[11] On December 21, 2016, the United States moved to stay this action pending the final outcome
of the three cases challenging the U.S. International Trade Commission's ("ITC") negative final
injury determination in the companion injury investigations that correspond with the
administrative determination at issue here.  Mot. to Stay, ECF Nos. 38–39.  The United States
argued that a stay was warranted because, "until and unless the ITC's negative final injury
determination is reversed, the Court cannot provide meaningful relief to plaintiff ArcelorMittal
USA, LLC, even if ArcelorMittal were to prevail in this action."  Id. at 2.  ArcelorMittal opposed
that motion on January 9, 2017.  ECF No. 40.  The court granted the United States' motion on
January 12, 2017.  ECF No. 41.  The court separately consolidated the three referenced ITC cases
under the heading ArcelorMittal USA LLC v. United States, Consol. Case No. 16-00214.
ArcelorMittal moved for reconsideration of the court's order one week later.  ECF No. 42.  In
response, on February 7, 2017, the United States stated that its counsel "have consulted with ITC
counsel representing the United States in ArcelorMittal USA LLC v. United States, Consol. Case
No. 16-00214.  Based on these interagency discussions, and to preserve the Court's and the parties'
resources across both the Commerce and ITC cases, we request that the Court vacate its January
12, 2017 order and allow this case to proceed first."  Resp. to Mot. for Reconsideration at 2, ECF
No. 44.  The court thus granted the motion for reconsideration on March 1, 2017, allowing this
case to proceed while staying Consol. Court No. 16-00214.  ECF No. 47.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).  The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

## DISCUSSION

### I.   Commerce's Reliance on the Invoice Date as the Date of Sale Is Supported by Substantial Evidence and in Accordance with Law.

 "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  This includes "contradictory evidence or evidence from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)).  However, "[a]n agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence."  Viet I-Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

The date of sale regulation sets forth a rebuttable presumption that "[Commerce] normally will use the date of invoice."  19 C.F.R. § 351.401(i).  As noted supra, Commerce "may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date

on which the exporter or producer establishes the material terms." Id.; see Sahaviriya Steel Indus.

Pub. Co. v. United States, 304 CIT 709, 726, 714 F. Supp. 2d 1263, 1279 (2010) ("Commerce's

methodology is consistent with the principle that a party fails to rebut the presumption that date of

invoice shall be used where there is a substantial variation between the quantity shipped and the

tolerance level specified in a contract.") (citations omitted), aff'd, 649 F. 3d 1371 (Fed. Cir. 2011).

The Preamble to the date of sale regulation emphasizes Commerce's focus on locating a meeting

of the minds between the contracting parties:

> If [Commerce] is presented with satisfactory evidence that the
> material terms of sale are finally established on a date other than the
> date of invoice, [Commerce] will use that alternative date as the date
> of sale. . . . However, [Commerce] emphasizes that in these
> situations, the terms of sale must be firmly established and not
> merely proposed. A preliminary agreement on terms, even if
> reduced to writing, in an industry where renegotiation is common
> does not provide any reliable indication that the terms are truly
> "established" in the minds of the buyer and seller. This holds even
> if, for a particular sale, the terms were not renegotiated.

62 Fed. Reg. at 27,349.  Thus an interested party proposing an alternate date of sale bears the

burden of demonstrating that the material terms of sale were "firmly" and "finally" established on

its proposed date. See Toscelik, 256 F. Supp. 3d at 1263 (citing Preamble, 62 Fed. Reg. 27,296,

27,348–49); Allied Tube and Conduit Corp. v. United States, 25 CIT 23, 25, 132 F. Supp. 2d 1087,

1090 (2001).  Accordingly, to successfully rebut Commerce's presumptive selection of the invoice

date, an interested party must demonstrate "that a reasonable mind has one, and only one, date of

sale choice." Toscelik, 256 F. Supp. 3d at 1263 (citing Allied Tube, 127 F. Supp. 2d at 220

("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient

weight and authority as to justify its [date of sale] as the only reasonable outcome.")).

The parties agree that quantity, price, delivery, and payment are material terms of sale relevant to the date of sale determination.[12]  Pl.'s Br.; Def.'s Br.; see USEC, Inc. v. United States, 31 CIT 1049, 1055, 498 F. Supp. 2d 1337, 1343 (2007).  ArcelorMittal argues that Commerce, in the Final Determination, ignored relevant evidence and improperly analyzed other evidence in concluding that there were changes in the materials terms of Novex's United States sales that occurred between the contract dates and the invoice dates.  Pl.'s Br. at 17.  Specifically, ArcelorMittal argues that Commerce should have analyzed differences in quantity reflected in the sales contracts on an aggregate basis, meaning according to the total quantity and accompanying tolerance for each contract, rather than on a specification basis.  Id. at 22; see IDM at 46. ArcelorMittal asserts that the structure of Novex's sales contracts establish weight tolerances that are applicable to the aggregate quantity of the entire order.  Pl.'s Br. at 22 (citing Sales Verification Report, at Exs. SV-23, SV-24, SV-25, and SV-26; IDM at 47).

The court is not persuaded by ArcelorMittal's argument that Commerce improperly analyzed quantity differentials between contract dates and corresponding invoice dates on the basis of tolerance per specification, rather than aggregate contractual tolerance.  As explained supra, while each contract at issue features a clause[13] that defines an aggregate weight tolerance for that

---

[12] While the Government references only price and quantity in its brief, ArcelorMittal argues that Commerce's administrative practice identifies four criteria as constituting the material terms of sale:  price, quantity, delivery, and payment.  Pl.'s Br. at 16 (citing Sahaviriya Steel, 714 F. Supp. 2d at 1280; Nakornthai Strip Mill Pub. Co. v. United States, 33 CIT 326, 337–38, 614 F. Supp. 2d 1323, 1334 (2009)).  The parties at oral argument agreed that these four criteria constitute material terms of sale.  Regardless, for the reasons discussed infra, the court's analysis does not hinge on the question of whether delivery and payment also constitute material terms of sale for the purposes of the date of sale determination.

[13] As noted supra n.6, this clause is [[                              ]].

contract plus or minus a certain percentage at seller's option, each contract also features two

clauses stating that the mill specification sheet appended to each contract are integral to the

contract.[14]  See Exs. SV-23, SV-24, SV-25, SV-26.  A reasonable mind could conclude that the

integrated mill specification sheets, due to their precision regarding qualities of the specifications

and the quantity tolerance relevant to each specification therein, are crucial to the "firm[]" and

"final[]" establishment of the material terms of sale -- specifically, the material term of quantity.

See Toscelik, 256 F. Supp. 3d at 1263 (citing Preamble, 62 Fed. Reg. 27,296, 27,348–49).  As

Commerce found, the material term of quantity for at least one specification changed between the

date of contract and the corresponding date of invoice.  IDM at 46.  The agency thus reasonably

determined that the material terms of sale were not "firmly" and "finally" established until the date

of invoice.  Id. at 46–47 (citing U.S. Preselect Sale 2, Specification at Issue);[15] see Preamble, 62

---

[14] As noted supra n.5, these clauses are [[                                                    ]] and [[
                               ]] both of which state that the mill specification sheet appended to each
contract [[                                                            ]].

[15] ArcelorMittal also argues that an aggregate, rather than specification-based, weight tolerance
analysis is consistent with Commerce's administrative practice. Pl.'s Br. at 22–24 (citing Certain
Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 49,622 (final results), and
accompanying IDM cmt. 9 ("[A]ny differences between the quantity ordered and the quantity
shipped which fall within the tolerance specified by the entire contract do not constitute changes
in the material terms of sale."); Certain Welded Carbon Steel Pipes and Tubes from Thailand, 65
Fed. Reg. 60,910 (Dep't Commerce Oct. 13, 2000) (final results), and accompanying IDM cmt. 1
(determining that the changes in the aggregate shipped quantities from the date of the relevant
contract to the corresponding date of invoice were within the aggregate weight tolerance agreed to
by both buyer and seller and thus did not constitute changes to the terms of the contract)).
          The court is not persuaded by this argument.  The determinations cited by ArcelorMittal
address situations where the contract specifies only an aggregate quantity tolerance, rather than
multiple specifications with accompanying tolerances as in the Novex contracts at issue here.  See
Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 49,622; Pipes and Tubes from
Thailand, 65 Fed. Reg. 60,910.  By contrast, Commerce in the instant proceeding reasonably
explained its decision to compare quantities by specification-based tolerances, rather than
aggregate tolerances, as explained supra.

Fed. Reg. at 27,296 ("In [19 C.F.R. § 351.401(i)], we merely have provided that, absent satisfactory evidence that the terms of sale were finally established on a different date, [Commerce] will presume that the date of sale is the date of invoice.").  ArcelorMittal alternatively argues that, even on the basis of comparison between individual specifications in the contract and in the invoice -- the methodology Commerce applied here -- there occurred no change in material terms, because the altered quantity at issue was minimal.[16]  Pl.'s Br. at 26–27.  As to the remaining three material terms of sale, ArcelorMittal asserts that Commerce addressed none of the record information it submitted in its administrative case brief regarding price, delivery, or payment, and that the agency cited no record evidence demonstrating any change in those terms between the date of the contract and the invoice date for any of the U.S. sales reported by NLMK.  Id. at 17–20.  Altogether, ArcelorMittal contends that "in the face of overwhelming evidence demonstrating that all quantities remained materially the same but for one transaction of a minimal quantity, Commerce nevertheless relied on invoice date.  That conclusion was not based on substantial evidence."  Id. at 27.  Procedurally, ArcelorMittal argues that Commerce did not fairly evaluate the record in this regard.[17]  Pl.'s Reply at 7–9.

These arguments fail to rebut the presumption that Commerce will use the invoice date as the date of sale under the applicable standard.  ArcelorMittal, and not Commerce, must carry the

---

[16] ArcelorMittal argues that the single transaction upon which Commerce based its analysis accounts for a very small percentage -- specifically, [[                    ]] -- of Novex's entire reported United States sales file.  Pl.'s Br. at 26, Attachment 1.

[17] In its notice of supplemental authority submitted following oral argument, ArcelorMittal contends that Commerce's conclusion -- that the quantity change in the invoice for one shipment constitutes a change to the material terms of sale established in the contract -- runs contrary to contract law principles, under which the quantity change should be considered a shipment of a nonconforming good rather than a change to the material terms of sale.  Pl.'s Suppl. Auth. at 2, ECF No. 75 (citing UNIFORM COMMERCIAL CODE § 2-106(2)).

burden of demonstrating that its proffered date of sale is not merely the superior option but also the only reasonable one. See Toscelik, 256 F. Supp. 3d at 1263; Allied Tube, 127 F. Supp. 2d at 220. ArcelorMittal presents no binding authority establishing that the change in quantity for the Specification at Issue, of U.S. Preselect Sale No. 2, is immaterial such that Commerce's reliance on the presumptive invoice date is unreasonable. Pl.'s Br. at 26. Commerce found that this change in quantity was "substantially outside the weight tolerance specified in the contract, and thus the quantity term of that contract changed after the date of contract." IDM at 46–47. Just as it was reasonable for Commerce to determine that a specification-based quantity analysis was appropriate for Novex's contracts in the record here, so too was it reasonable for Commerce to find that a change in quantity beyond the tolerance accompanying at least one of those specifications was material. Id.

Further, the fact that several material terms -- here the price, delivery, and payment terms -- were consistent between the date of invoice and the date of contract does not mean that the inconsistency in the quantity term is irrelevant to the court's analysis of Commerce's date of sale determination. See U.S. Preselect Sale No. 2, Specification at Issue. That consistency notwithstanding, Commerce's determination to apply the presumptive date of sale -- the invoice date -- is reasonable and supported by record evidence in its own right, for the reasons stated supra. Under the Court's standard of review, the possibility of drawing two inconsistent conclusions from a given record does not preclude substantial evidence support for either conclusion. See Viet I-Mei Frozen Foods, 839 F.3d at 1106. Even assuming arguendo that ArcelorMittal's proffered date of sale were supportable with substantial record evidence, it would not constitute the only reasonable option. See Toscelik, 256 F. Supp. 3d at 1263; CC Metals & Alloys, LLC v. United States, 40 CIT ___, ___, 145 F. Supp. 3d 1299, 1305 (2016). Commerce's conclusion that a

material term changed between the contract date and the invoice date such that material terms were

not "firmly" and "finally" established until the latter retains substantial evidence support, even

where other material terms did not change.[18]

       In sum, ArcelorMittal has not rebutted the regulatory presumption favoring the invoice

date as the date of sale, and Commerce's determination in regard to that issue stands.

## II.   **Commerce's Use of the Consolidated U.S. GAAP Statements Is Permitted by Statute and Supported by Substantial Evidence.**

       ArcelorMittal argues that Commerce's reliance on NLMK's 2014 consolidated financial

statements to calculate NLMK's financial expense ratio is inconsistent with the relevant statute

and is not supported by substantial evidence.  Pl.'s Br. at 28–36.  Specifically, ArcelorMittal

contends that Commerce's use of consolidated statements prepared in accordance with U.S. GAAP

is contrary to 19 U.S.C. § 1677b(f)(1)(A)'s directive that a company's "[c]osts shall normally be

calculated" using statements prepared in accordance with the exporting or producing country's

GAAP and Commerce did not sufficiently justify this alleged departure from the statute.  Id. at

---

[18] NLMK contends that other material terms, specifically, regarding delivery, did indeed change between the contract date and the invoice date.  Def.-Inter.'s Br. at 13.  NLMK asserts that one of its contracts at issue, [[                              ]] states that the shipment date from the port of the contract would be at [[                                        ]].  Def.-Inter.'s Br. at 13 (citing Petitioners' Case Brief at Attachment 1).  However, NLMK contends that the bill of lading date for this contract was [[                    ]], later than the dates stated in the contract. Def.-Inter.'s Br. at 13.  Thus, NLMK argues that the delivery terms in the contract were not observed, and the presumptive invoice date more accurately accounts for the material terms of sale.

       The court notes that Commerce did not analyze this data point, see IDM at 45–47, and therefore declines to consider it in regard to the soundness of the agency's date of sale determination.  See Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1377 (Fed. Cir. 2012) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (quoting Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943))).

28–29.  The court finds these arguments unavailing, and holds that Commerce's determination is

consistent with the statute and supported by substantial evidence.

19 U.S.C. § 1677b(f)(1)(A) provides that:

> Costs shall normally be calculated based on the records of the
> exporter or producer of the merchandise, if such records are kept in
> accordance with the generally accepted accounting principles of the
> exporting country (or the producing country, where appropriate) and
> reasonably reflect the costs associated with the production and sale
> of the merchandise. The administering authority shall consider all
> available evidence on the proper allocation of costs, including that
> which is made available by the exporter or producer, in particular
> for establishing appropriate amortization and depreciation periods,
> and allowances for capital expenditures and other development
> costs.

Since the language of the statute -- i.e., "normally be calculated" -- allows for exceptions to the

use of records kept in accordance with a country's GAAP,[19] particularly if those records do not

---

[19] Russian law -- particularly, Russian Law No. 208-FZ -- required companies to transition to
compiling their financial statements under International Financial Reporting Standards ("IFRS"),
but explicitly permitted "companies that were . . . preparing consolidated financial statements on
a basis distinct from IFRS . . . to continue preparing their non-IFRS based financial statements
until 2015." IDM at 55–56; 3d Sec. D SQR at Exhibit 3-3 (Russian Law No. 208-FZ), C.R. 510,
P.R. 313.  Since NMLK "historically prepared its audited consolidated financial statements in
accordance with U.S. GAAP," Commerce verified that the 2014 consolidated statements were
prepared in accordance with Russian Law No. 208-FZ and thus in accordance with Russian GAAP.
IDM at 55–56 (stating that Russian GAAP permitted NMLK to "prepare its audited consolidated
financial statements in accordance with U.S. GAAP" and that the 2014 audited consolidated
statements were thus "acceptable under Russian GAAP").  ArcelorMittal does not challenge
Commerce's conclusion that NMLK's 2014 consolidated financial statements were prepared in
accordance with Russian law.  However, ArcelorMittal does argue that "[a]lthough Commerce
concluded that the 2014 consolidated statements were prepared in accordance with U.S. GAAP
and in compliance with Russian law, this analysis is not consistent with the statutory language,
which states a clear preference for reliance on respondent's books and records that are kept in
accordance with the home country's GAAP.  While Russian law may permit a company to rely on
U.S. GAAP to prepare its financial statements, this has no bearing on whether such statements also
accord with Russian GAAP."  Pl.'s Br. at 33.  Although defendant-intervenor NMLK disagrees
with ArcelorMittal's distinction and argues for a more expansive interpretation of the statute, the
Government agrees with ArcelorMittal on this issue.  Oral Argument.  Since this issue is not in
dispute between ArcelorMittal and the Government in this case, the court declines to discuss it
further.

reasonably reflect relevant costs, "the question becomes whether Commerce . . . reasonably invoked an exception to the rule."  Luoyang Bearing Corp. v. United States, 28 CIT 733, 743, 347 F. Supp. 2d 1326, 1338 (2004).  When assessing whether records reasonably reflect relevant costs, the statute further provides that Commerce "shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs."  19 U.S.C. § 1677b(f)(1)(A).

Here, Commerce selected the statements in question because they were prepared at the highest level of consolidation, which reflects longstanding Commerce practice.  ArcelorMittal contends that Commerce's use of the consolidated U.S. GAAP statements -- rather than the unconsolidated RAS statements -- violates the statute because the statute requires Commerce to use statements prepared in accordance with Russian GAAP unless Commerce makes a finding, supported by substantial evidence, that the RAS statements do not accurately reflect NLMK's costs.  ArcelorMittal further suggests that Commerce impermissibly "bypass[ed] explicit statutory guidance governing its calculation of the costs of producing subject merchandise (and, here, the calculation of NLMK's financial expense ratio) and instead rel[ied] on its administrative practice as a basis for performing its calculations based on a financial statement that was not prepared in accordance with home country GAAP."  Pl.'s Br. at 36.

However, Commerce chose to use the 2014 consolidated statements not only because of longstanding administrative policy, but because it reasonably believed that the unconsolidated statements did not reflect NLMK's expenses as accurately as the consolidated U.S. GAAP statements in light of NLMK's subsidiary relationship to the Fletcher Group.  IDM at 56.  As the Federal Circuit has noted,

> standard accounting principles acknowledge consolidated financial
> statements as a fair presentation of the financial position of a group.
> See, Floyd A. Beams, Advanced Accounting 74, 77, 91, 102–03 (5th
> ed. 1992). Following those practices, Commerce has adopted and
> followed a standard policy for assessing finance costs of a producer
> based on the consolidated financial statements of a parent because
> the cost of capital is fungible. Commerce's policy recognizes that
> consolidated financial statements indicate that a corporate parent
> controls a subsidiary. These consolidated statements represent the
> financial health of parent company operations in view of subsidiary
> operations. In addition, fungible financial assets invite
> manipulation. In other words, if Commerce used only a single
> division of a group as the source of financing costs, the controlling
> entity could shift borrowings from one division to another to defeat
> accurate accounting.

Am. Silicon Techs. v. United States, 334 F.3d 1033, 1037 (Fed. Cir. 2003).  Thus, Commerce's

decision to use the highest consolidated financial statements was reasonable.

Finally, ArcelorMittal claims that Commerce's use of the consolidated financial statements

is inconsistent with the agency's "expressed preference for financial statements prepared in

accordance with home country GAAP," and cites a proceeding involving rebar from Turkey as

evidence of this preference.  Pl.'s Br. at 34; Issues and Decision Memorandum for the Antidumping

Duty Administrative Review on Certain Steel Concrete Reinforcing Bars from Turkey -- April 1,

2004, through March 31, 2005 (Dep't Commerce Nov. 1, 2006) ("Rebar from Turkey").  In that

proceeding, Commerce addressed 19 U.S.C. § 1677b(f)(1)(A)'s preference for the use of financial

statements prepared in accordance with home country GAAP when explaining why it chose to use

statements prepared in accordance with Turkish GAAP instead of statements prepared in

accordance with International Accounting Standards.  Rebar from Turkey cmt. 6.  However, in

Rebar from Turkey, Commerce chose between two sets of unconsolidated statements; here,

Commerce had consolidated and unconsolidated statements available, distinguishing this case

from Rebar in Turkey.

**PUBLIC VERSION**                                                                    Page 23
Court No. 16-00173

     For these reasons, the court is unpersuaded by ArcelorMittal's arguments, and determines

that Commerce's use of the 2014 consolidated statements was supported by substantial evidence

and in accordance with 19 U.S.C. § 1677b(f)(1)(A).

<b>CONCLUSION</b>

     For the foregoing reasons, Commerce's <u>Final Determination</u> is sustained.

<u>So ordered.</u>

<u>/s/   Gary S. Katzmann</u>
Gary S. Katzmann, Judge

Dated:  <u>April 3, 2018</u>
      New York, New York